UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

SUNI MUNSHANI and
SURESH MUNSHANI,

*Defendants*

No. 22-CR-215 (JSR)

## SENTENCING MEMORANDUM OF SUNI MUNSHANI

MCDERMOTT WILL & EMERY LLP

Mark W. Pearlstein (*Admitted Pro Hac Vice*)
200 Clarendon Street, Floor 58
Boston, MA 02116-5021
E-mail: MPearlstein@mwe.com
Telephone: (617) 535-4425

Jessica Greer Griffith (No. 5337076)
One Vanderbilt Avenue
New York, NY 10017-3852
E-mail: GGriffith@mwe.com
Telephone: (212) 547-5578

*Attorneys for Defendant Suni Munshani*

**TABLE OF CONTENTS**

I.  INTRODUCTION ...................................................................................................1

II.  PROCEDURAL HISTORY...................................................................................4

III.  CONSIDERATION OF SECTION § 3553(A) FACTORS SUPPORT A SENTENCE
BELOW THE STATUTORY MAXIMUM ..............................................................4

    A.  Suni's Significant Health Issues ................................................................5

        1.  Extensive Family History Of Cardiac Dysfunction And Arrythmia ..........8

        2.  Syncopal Episodes .................................................................8

        3.  Other Significant Heart Issues ..................................................9

        4.  Need For Medical Care...........................................................11

    B.  Suni's Personal History And Characteristics ...........................................13

        1.  Suni's Childhood Was Filled With Traumatic Events..............................13

        2.  Suni Has A Strong Network Of Supportive Family Members And Friends
....................................................................................15

            i.  Suni Is a Devoted Husband and Father.........................................16

            ii.  Suni Has Helped Many People Through The Years.....................19

        3.  Suni Is An Active Volunteer.................................................22

        4.  Suni Is A Trusted Mentor Who Has Guided Mentees From Various Walks
Of Life........................................................................24

    C.  The Proposed Sentence Is Sufficient, But Not Greater Than Necessary, To
Promote Respect For The Law and Afford Adequate Deterrence.........................26

    D.  No Purpose Would Be Served By Incarcerating Suni For More Than 18 Months27

    E.  Suni Poses No Future Threat To The Public ............................................28

IV.  SUNI'S COOPERATION WITH LAW ENFORCEMENT ..............................................29

V.  THE CIRCUMSTANCES OF THE CRIME...................................................................29

VI.  THE PROPOSED SENTENCE IS SUFFICIENT, BUT NOT GREATER THAN
NECESSARY, TO ACHIEVE THE GOALS OF SENTENCING ...................................30

VII.   CONCLUSION...................................................................................................................31

## **TABLE OF AUTHORITIES**

**Cases**                                                                                   **Page(s)**

*Deutsche Bank AG v. Sebastian Holdings Inc.*,
   [2023] EWCA Civ 191 ..................................................................................................30

*Gall v. United States*,
   552 U.S. 38 (2007)........................................................................................................4

*Garavito-Garcia v. United States*,
   544 F. Supp. 3d 484 (S.D.N.Y. 2021)........................................................................7

*Nelson v. United States*,
   555 U.S. 350 (2007)......................................................................................................4

*United States v. Adelson*,
   441 F. Supp. 2d 506 (S.D.N.Y. 2006)........................................................13, 26, 31

*United States v. Almenas*,
   553 F.3d 27 (1st Cir. 2009)..........................................................................................7

*United States v. Azim*,
   Index No. 21-cr-427 (KPF) (S.D.N.Y 2022) .....................................................5, 6, 12

*United States v. Barquet*,
   504 F. App'x 34 (2d Cir. 2012).................................................................................29

*United States v. Butler*,
   Index No. 08-cr-370, 2011 WL 4073672 (E.D.N.Y. Sept. 13, 2011)......................15

*United States v. Butler*,
   264 F.R.D. 37 (E.D.N.Y. 2010) ...............................................................................16

*United States v. Figueroa*,
   421 Fed. Appx. 23 (2d Cir. 2011) ...............................................................................6

*United States v. Gupta*,
   904 F. Supp. 2d 349 (S.D.N.Y. 2012)...................................................4, 13, 22, 31

*United States v. Hamid*,
   Index No. 17-cr-46 (RA) (S.D.N.Y 2017) ..................................................................5

*United States v. Harding*,
   Index No. 05-cr-1285-02 (RWS), 2006 WL 2850261 (S.D.N.Y.
   Sept. 28, 2006) ....................................................................................................15, 16

*United States v. Huntley*,
   961 F. Supp. 2d 409 (E.D.N.Y. 2013) ......................................................................23

*United States v. Jodoin*,
    816 F. App'x 394 (11th Cir. 2020) ..........................................................................15

*United States v. Johnson*,
    Index No. 16-CR-457-1 (NGG), 2018 WL 1997975 (E.D.N.Y. Apr. 27, 2018) ......................6

*United States v. Little*,
    Index No. 17-cr-450 (KPF) (S.D.N.Y. April 5, 2018) .................................6, 22, 23

*United States v. Lumiere*,
    Index No. 16-cr-483 (JSR) (S.D.N.Y. June 27, 2017) ..................................... *passim*

*United States v. Mays*,
    967 F.3d 748 (8th Cir. 2020) ..........................................................................15

*United States  v. McFarlin*,
    535 F.3d 808 (8th Cir. 2008) ...........................................................................6

*United States v. Mendez-Castro*,
    655 F. App'x 115 (3d Cir. 2016) ......................................................................15

*United States v. Moore*,
    344 F. App'x 767 (3d Cir. 2009) ......................................................................29

*United States v. Poetz*,
    582 F.3d 835 (7th Cir. 2009) ...........................................................................7

*United States v. Statman*,
    604 F.3d 529 (8th Cir. 2010) ......................................................................7, 12

*United States v. Watson*,
    482 F.3d 269 (3d Cir. 2007) ..........................................................................12

## Statutes

18 U.S.C. § 371 ..........................................................................................4, 30

18 U.S.C. § 3553 ................................................................................... *passim*

18 U.S.C. § 3663A(2) ...................................................................................4

## Other Authorities

U.S.S.G. §5K ...............................................................................................28

"Annual Determination of Average Cost of Incarceration Fee", A Notice by the
Prisons Bureau on 9/1/202, 86 Fed. Reg. 49060, *available at*:
https://www.federalregister.gov/documents/2021/09/01/2021-18800/annual-
determination-of-average-cost-of-incarceration-fee-coif. .......................................................27

Jillian Hewitt, *Fifty Shades of Gray: Sentencing Trends in Major White-Collar
Cases*, 125 YALE L.J. 1018 (2016) .............................................................................................5

Tracey Kyckelhahn & Trishia Cooper, *The Past Predicts the Future: Criminal
History and Recidivism of Federal Offenders*, U.S. SENTENCING COMM'N,
(Mar. 2017), *available at*:
https://www.ussc.gov/sites/default/files/pdf/researchand-
publications/research-publications/2017/20170309_Recidivism-CH.pdf.............................27

The Defendant, Suni Munshani ("Suni")[1], by and through undersigned counsel, respectfully submits this Sentencing Memorandum in support of his request to be sentenced to 18 months imprisonment, 24 months supervised release, and restitution in the full amount sought by the government, $10,485,043.

## I.   INTRODUCTION

Suni has pleaded guilty to one count of conspiracy to commit wire fraud in relation to a scheme he executed against Protegrity USA, Inc. ("Protegrity"), a company for which he served as Chief Executive Officer.  Suni is deeply remorseful and regrets his actions.  He recognizes that he has damaged Protegrity, and that he has deeply embarrassed and broken the hearts of his family, friends, and colleagues who are suffering greatly from his actions.  Suni recognizes that his conduct was inexcusable, and asks only that the crime should not define him.  The sentencing factors in 18 U.S.C. §3553 mitigate in favor of a prison sentence substantially below the 5-year term being sought by the government.

Suni is a loving husband, devoted father, caring friend, trusted mentor, active community member, and generous volunteer.  Before Suni committed the conduct in this case, he was living the American dream.  Suni was born and raised in a family of modest means in India.  He overcame traumatic childhood events (including ███████████████, a traumatic fall that hospitalized him for a period of time, and childhood health issues) and earned his university degree from the Indian Institute of Technology in Kharagpur, India.  He immigrated to the United States where he met his wife of more than 26 years and had his beloved daughter.  Suni became a successful business professional and entrepreneur through grit and hard work.

---

[1] The co-defendant is Suresh Munshani, the defendant's brother.  He was convicted following a jury trial and is awaiting sentencing.

Despite his demanding career, Suni always found time to play an active role in the upbringing of his daughter, to help friends in need, to mentor individuals from all facets of life, and to volunteer in his community.  Indeed, the numerous individuals who have written letters to the Court on his behalf all speak to how Suni had a well-deserved reputation amongst family, friends, colleagues, mentees, and community members as someone who is generous, dedicated, reliable, and honorable.[2]  Now, as a result of his actions, Suni's hard-earned reputation and career have been destroyed.

Suni is currently suffering from significant heart disease.  Since late 2021, as a result of his heart disease, he has been experiencing frequent syncopal episodes that cause him to completely black out, faint, and fall with no warning.  Incarceration will substantially increase Suni's risk of serious injury, and potentially even death, as he will have reduced access to urgent specialized healthcare and his cardiac condition will likely worsen due to the high-stress environment of a Bureau of Prisons facility.[3]

Physicians are in the process of evaluating Suni's cardiac condition to determine whether he needs a permanent pacemaker.  An insertable cardiac monitor (also known as an implantable loop recorder) was implanted, so that his healthcare providers can remotely monitor his heart's rhythm over an extended period of time.  For this monitor to work, Suni will need to be able to access a smartphone (with the MyCareLink Heart mobile app downloaded on it) or a transmitter device provided by the manufacturer so that the information collected by the cardiac monitor can be transmitted to Suni's physicians. The cardiac monitor uses Bluetooth wireless technology to transmit data to physicians via either a smartphone app or the transmitter device.

---

[2] The letters submitted to the Court on Suni's behalf are attached to this memorandum as Exhibits A through T.

[3] Ex. A, Dr. Marsel Huribal letter to the Court, at 2-3.

Suni stands before this Court for sentencing as a non-violent, first-time offender who is an active participant in the lives of his family, friends, mentees, and community members.  As the Probation Officer recognizes, Suni is very unlikely to commit future crimes and hopes to continue to devote his life to helping others.

Since accepting responsibility for his criminal conduct, Suni has taken numerous steps to redress his wrongdoing, including cooperating with the prosecution of his brother and beginning to make a dent in his restitution obligations.  Pursuant to an order entered by the Court, he has sold a parcel of real estate and surrendered the net proceeds of $370,962.64 to the U.S. Marshal. The sale only occurred after the U.S. Marshal concluded that the sale was an arms-length transaction at an appropriate sales price.

Suni requests that this Court consider these factors, along with other reasons set forth in this memorandum, to determine that a downward variance from the applicable guidelines range is appropriate under 18 U.S.C. § 3553.  Suni requests a sentence of 18 months imprisonment to be followed by a term of 24 months supervised release, and the payment of full restitution in the amount of $10,485,043, which is the amount reflected in the plea agreement.[4]  While Suni will be forfeiting assets to the government, those assets should be made available by the government to the victim, Protegrity, and serve to reduce Suni's restitution obligation. The recommended sentence would be sufficient, but not greater than necessary, to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

---

[4] While Protegrity argues in its Victim Impact Statement for a larger sum, the Court should follow the government's recommendation and impose restitution in the amount of $10,485,043.  The additional sums sought by Protegrity are not recoverable as losses resulting from the crime of conviction under 18 U.S.C. § 3663A(2).  Protegrity is engaged in civil litigation with Suni and presumably can press each of its claims there.

Suni requests that the Court designate him to serve the incarceration component of his sentence at FCI-Devens, and that he be permitted to self-surrender, 90 days after sentencing, to enable his physicians to provide necessary treatment for his cardiac condition.

## II.   PROCEDURAL HISTORY

Suni was named as a defendant in an indictment returned on April 11, 2022.  (ECF No. 1.) He plead guilty to conspiracy to commit wire fraud in violation of 18 U.S.C. § 371, on December 9, 2022.  Pursuant to a plea agreement, the government has agreed to dismiss the remaining charges at sentencing.

## III.   CONSIDERATION OF SECTION § 3553(A) FACTORS SUPPORT A SENTENCE BELOW THE STATUTORY MAXIMUM

As this Court has stated, imposing a sentence "requires a court to consider, with great care and sensitivity, a large complex of facts and factors. The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense."  *United States v. Gupta*, 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012).

The Guidelines Sentencing Range (the "GSR") in this case – 87 to 108 months – exceeds the 60-month statutory maximum for violations of 18 U.S.C. § 371.  However, the GSR is merely a factor to be considered at sentencing because the GSR often "reflect[s] an even more draconian approach to white collar crime, unsupported by any empirical data."  *Gupta*, 904 F. Supp. 2d at 351.

Indeed, courts "may not presume that a Guidelines sentence is reasonable," and instead are required to "consider all of the § 3553(a) factors to determine whether they support the sentence requested."  *Gall v. United States*, 552 U.S. 38, 49–50 (2007).  *See also Nelson v. United States*, 555 U.S. 350, 352 (2009) ("The Guidelines are not only *not mandatory* on sentencing courts; they

4

are also not to be *presumed* reasonable.").   18 U.S.C. § 3553(a) requires a sentence that is "sufficient, but not greater than necessary" to achieve the purposes of sentencing delineated in 18 U.S.C. § 3553.   The pertinent factors to consider here under § 3553(a) are: (1) the history and characteristics of the defendant, (2) the need to provide the defendant with adequate medical care, (3) the nature and circumstances of the offense, (4) the need to protect the public from further crimes of the defendant, and (5) the need to afford adequate deterrence.

Courts in this district analyzing the Section 3553 factors routinely impose sentences well below the Guidelines Sentencing Range.  *See, e.g.*, *United States v. Azim*, 21-cr-427 (KPF) (S.D.N.Y 2022), ECF No. 57 at 50:9–11, 54:1–10 (imposing sentence of 24 months imprisonment in spite of GSR of 41–51 months); *United States v. Hamid*, 17-cr-46 (RA) (S.D.N.Y 2017), ECF No. 47 at 4:18–23, 21:7–8 (imposing sentence of 21 months where GSR was 63–78 months). *See also* Jillian Hewitt, *Fifty Shades of Gray: Sentencing Trends in Major White-Collar Cases*, 125 YALE L.J. 1018, 1052–53 (2016) ("My findings suggest that, at least in the realm of major white-collar cases in one of the most prominent judicial districts in the country, [], Defendants in major white-collar cases in S.D.N.Y. are more likely than not to receive a sentence below the Guidelines range.  Moreover, when a below-range sentence is imposed, it is generally vastly shorter than the sentence recommended by the Guidelines.  The lengthy sentences produced under the Guidelines are rarely actually imposed, at least in S.D.N.Y.")

Consideration of the relevant Section 3553(a) factors here supports the requested sentence of 18 months imprisonment.

### A.    Suni's Significant Health Issues

Suni is currently suffering from significant health problems, notably cardiac issues, including serious arrythmias, carotid disease, and syncopal episodes (commonly referred to as

"fainting spells"), that reduce his life expectancy and put him at risk of suffering serious injury (and potentially even death) while he is incarcerated.

Courts routinely grant sentences below the GSR based upon a defendant's health issues and reduced life expectancy. *See, e.g.*, *United States v. Figueroa*, 421 Fed. Appx. 23, 25 (2nd Cir. 2011) (affirming a below-Guidelines sentence because of the defendant's "individual circumstances" and "physical condition", including the defendant's "health and life expectancy"); *United States v. McFarlin*, 535 F.3d 808, 810–12 (8th Cir. 2008) (affirming a below-Guidelines sentence of probation imposed for conspiracy to distribute crack cocaine based on the defendant's age, serious health problems (including anxiety, depression, nervous disorders, and heart disease), significantly reduced life expectancy (a letter submitted by his physician opined that his life expectancy was approximately ten to twenty years less than the average African American male), and his post-arrest rehabilitation); *United States v. Azim*, 21-cr-427 (KPF) (S.D.N.Y June 8, 2022), ECF 57 at 52:23–53:3 (imposing a sentence below the GSR because of defendant's "health conditions and principally because . . . the Bureau of Prisons will not be able to adequately account for the conditions that" defendant had); *United States v. Johnson*, Index No. 16-CR-457-1 (NGG), 2018 WL 1997975 at *5 (E.D.N.Y. Apr. 27, 2018) ("I also believe that a departure is warranted under § 3553(a) based [in part] upon [defendant's] medical condition."); *United States v. Little*, Index No. 17-cr-450 (KPF) (S.D.N.Y. April 5, 2018), ECF No. 59 at 70:12–14 ("I have also been asked to consider [defendant's] mental health issues, and I have."); *United States v. Lumiere*, No. 16-cr-483 (JSR) (S.D.N.Y. June 27, 2017), ECF No. 115 at 29:6–11 ("very much [taking] into account" defendant's "certain psychological vulnerabilities . . . that would raise certain possible

dangers or hardships associated with prison time that would not necessarily be true of other similarly situated individuals").[5]

Dr. Marsel Huribal, a Board-certified general and vascular surgeon and founder of The Vascular Experts, the largest group of Board-certified vascular surgeons in the country, wrote a letter to this Court describing Suni's cardiac condition and his opinion of Suni's reduced life expectancy.[6]  Specifically, Dr. Huribal opined that Suni's life expectancy is impacted "by his significant medical conditions and family history."[7]  He also stated "that factors such as lifestyle, stress, environment, and access to immediate, specialized medical care also play a role" in life expectancy.[8]

In Dr. Huribal's opinion, "incarceration would substantially increase Mr. Munshani's risk of serious injury (and potentially even death) as the stress and reduced access to urgent specialized healthcare would significantly exacerbate his cardiac dysfunction, the frequency of syncopal episode occurrences, and his overall medical condition."[9]  Dr. Huribal explained, "Based on Mr. Munshani's current ill health and condition, even a year in prison may be a life sentence for him due to the impact this high stress environment will have on his cardiac condition and syncopal

---

[5] *See also United States v. Statman*, 604 F.3d 529, 534–35 (8th Cir. 2010) (affirming a below-Guidelines sentence where the district court considered the defendant's medical condition and "recommended [defendant] be held in an institution which would have sufficient medical facilities to treat [defendant's] various illnesses"); *United States v. Almenas*, 553 F.3d 27, 36–37 (1st Cir. 2009) (affirming a below-Guidelines sentence based in part on the defendant's health issues, including chronic back and neck pain); *United States v. Poetz*, 582 F.3d 835, 838 (7th Cir. 2009) (affirming a below-Guidelines sentence that was imposed "largely because of [defendant's] medical condition"); *c.f. Garavito-Garcia v. United States*, 544 F. Supp. 3d 484, 490–91 (S.D.N.Y. 2021) (finding that a sentence reduction under the First Step Act "is consistent with the § 3553(a) factors" in part because of the defendant's "advanced age and deteriorating health").
[6] Ex. A (Dr. Marsel Huribal).
[7] *Id.* at 3.
[8] *Id.*
[9] *Id.* at 2.

episode frequency, the fact that he will not likely receive the same type of urgent specialized healthcare that he would have access to if he were not incarcerated, and the risk of traumatic and severe injuries he may suffer from experiencing syncopal episodes while incarcerated."[10]

### 1.    *Extensive Family History Of Cardiac Dysfunction And Arrythmia*

Suni has an extensive family history of cardiac dysfunction and arrhythmia, which has resulted in the early death of most of the males on the maternal side of his family.[11]

### 2.    *Syncopal Episodes*

Since late 2021, Suni has been experiencing syncopal episodes that cause him to completely black out, faint, and fall.[12]   Suni's most recent syncopal episode occurred in January 2023.[13]   During this episode, he blacked out, fell, and injured his shoulder as a result of falling.[14]

Dr. Huribal believes that Suni's syncopal episodes are likely caused by cardiac arrythmia.[15] He explained that "[s]yncopal episodes are expected to occur more frequently when an individual is under high stress, which Mr. Munshani is currently experiencing and which will be exacerbated if he is incarcerated."[16]   Syncopal episodes are dangerous because they "increase [] individuals' risk of heart attacks, strokes, or other serious medical events that can cause significant damage or death."[17]   They also are dangerous because "[a]n individual experiencing a syncopal episode loses complete conciseness and may become severely injured in connection with the 'dead weight' of

---

[10] *Id.* at 3.
[11] Dr. Huribal explains that "[f]amily history is one factor that can provide insight into potential health risks that affect life expectancy."  *Id.* at 1.
[12] *Id.* at 2; PSR ¶ 77.
[13] Ex. A (Dr. Marsal Huribal) at 2.
[14] *Id.*
[15] *Id.* at 1.
[16] *Id.* at 2.
[17] *Id.*

an unprotected fall.  Injuries that occur as a result of a syncope episode vary in severity, but often include head injuries and can result in death depending on the nature of the fall."[18]

Receiving timely expert medical care is crucial in treating syncope.[19]  An expert in emergency medicine, cardiology, or neurology can perform a comprehensive evaluation, with diagnostic tests like an electrocardiogram, echocardiogram, or MRI, to determine the cause of the syncope.[20]  Time is often of the essence.[21]  Dr. Huribal states that Suni's health needs would best be addressed if he has access to caregivers familiar with his medical history.[22]

### 3.   *Other Significant Heart Issues*

In addition to arrythmias, Suni has long suffered from other heart issues.[23]  Dr. Huribal states that the natural pacemaker in Suni's heart is failing.[24]  "When a person's natural pacemaker in his heart (also known as the sinoatrial node or SA node) is failing, it means that it no longer is functioning properly and cannot regulate the heart rate effectively.  As a result, that individual's heart rate may become irregular or slow, causing symptoms such as fatigue or fainting.  If the pacemaker fails completely, it can lead to a life-threatening condition known as bradycardia, which is characterized by a slow heart rate that is not able to pump enough blood to meet the body's needs."[25]

Suni is in the process of having his heart monitored and evaluated so that his medical caregivers can best determine how to address his heart condition.[26]  On March 15, 2023, an

---

[18] *Id*.
[19] *Id*.
[20] *Id.*
[21] *Id.*
[22] *Id*.
[23] *Id.* at 1; PSR ¶ 68.
[24] Ex. A at 2.
[25] *Id.*
[26] *Id*.

insertable cardiac monitor was implanted in Suni's body which will record real-time data of his heart's rhythm and electrical activity to identify, monitor, and report abnormal heart rhythms or cardiac arrhythmias. The monitor captures data relating to cardiac episodes. When the monitor is connected to either the patient app or a home communicator provided by the manufacturer, the cardiac monitor will then wirelessly transmit the recorded data to the Medtronic Carelink Network. Dr. Huribal has explained that "[t]his cardiac monitor will allow Mr. Munshani's healthcare providers to remotely monitor his health. This device uses Bluetooth wireless technology to transmit collected data to physicians via a smartphone app. In order for this monitoring to continue effectively and to ensure a continuous connection, Suni will need to keep his smartphone on his possession. The precise period of time that this monitoring will need to occur is unclear, but it may take between several months to a year to determine how effective a permanent pacemaker would be for Mr. Munshani."[27]

Dr. Huribal has also explained that while "[a] permanent pacemaker would prevent Mr. Munshani's heart from stopping," it "cannot fix ventricular arrythmias, which are abnormal heartbeats that originate in one's lower heart chambers (called ventricles) which can cause cardiac arrest. In other words, if it is determined that Mr. Munshani needs an implantable pacemaker, this device should reduce the risk of his heart completely stopping, but he would remain at an elevated risk for ventricular and other potentially fatal arrythmias. An implantable pacemaker would reduce, but not eliminate, the risk of a fatal arrythmia."[28]

In addition to Suni's failing natural pacemaker and cardiac arrythmia, Dr. Huribal noted other conditions Suni is suffering from that also require further diagnosis and monitoring.[29]

---

[27] *Id.* at 2–3.
[28] *Id.* at 3.
[29] *Id.* at 1–2.

Dr. Huribal observed a carotid bruit during his clinical examination of Suni.[30]  He explained that "[t]his turbulence in the blood flow often is a sign of an arterial stenosis or blockage.  The cause of the carotid bruit needs to be diagnosed as soon as possible."[31]

Dr. Huribal also observed that Suni has mild to moderate stenosis based on his carotid ultrasound, which indicated mild to moderate plaque in both carotid bulbs.[32]  "Stenosis is a constriction of a body channel, such as an artery, vein, esophagus, or spinal canal.  It is usually caused by the buildup of plaque."[33]  Dr. Huribal explained that these conditions will need to be followed, and may require medications or surgery to treat.[34]

Dr. Huribal also stated that Suni will need his cerebrovascular distribution to be reevaluated in approximately 9-12 months.[35]  He explained that "cerebrovascular distribution refers to the blood supply to the brain.  The brain is supplied with blood by two main blood vessels, the internal carotid artery and the vertebral artery.  The internal carotid artery supplies blood to the front and side of the brain, while the vertebral artery supplies blood to the back of the brain.  The two arteries eventually unite to form the basilar artery, which supplies blood to the brainstem and the cerebellum.  The cerebrovascular distribution is important for maintaining the proper functioning of the brain, as any interruption in blood flow can result in a stroke or brain damage."[36]

### 4.    Need For Medical Care

Based on Suni's medical conditions, Dr. Huribal has concluded that "the best thing for Mr. Munshani's health would be for him to be in an environment with the least amount of stress

---

[30] *Id.* at 1.

[31] *Id*.

[32] *Id.* at 2.

[33] *Id*.

[34] *Id*.

[35] *Id*.

[36] *Id*.

possible where he would be able to have access to his cell phone for real time cardiac monitoring, access to medical care for his cardiac monitoring, and access to urgent medical care if he suffers a cardiac or syncopal episode."[37]

Given his health risks, Suni should be incarcerated in a facility where he can receive urgent, specialized healthcare, including cardiac care.[38]   And, to enable Suni's medical providers to best understand his medical condition and develop a future treatment plan, this Court should delay his self-reporting date for 90 days.  This delay would enable Suni to attend upcoming appointments he has scheduled with his physicians and potentially provide his physicians with adequate time to determine an appropriate course of treatment.

Suni's serious medical issues and his complex healthcare needs support a sentence substantially below the 60-month government recommendation.  *See Azim*, 21-cr-427 (KPF) (S.D.N.Y June 8, 2022), ECF 57 at 52:23–53:3 (imposing a sentence below the GSR because of defendant's "health conditions and principally because . . . the Bureau of Prisons will not be able to adequately account for the conditions that" defendant had).  *See also United States v. Watson*, 482 F.3d 269, 276 (3d Cir. 2007) (affirming a sentence lower than the GSR "on account of [defendant's] serious medical condition, [and] took his medical needs into account in recommending that he be placed in a medical facility"); *Statman*, 604 F.3d at 534–35 (affirming a sentence lower than the GSR where the district court recognized the defendant's "poor health and recommended [defendant] be incarcerated in 'an institution where they have medical facilities sufficient to treat his illnesses which [the court] consider[ed] quite serious'").

---

[37] *Id.* at 3.
[38] *Id*.

### B.    Suni's Personal History And Characteristics

The letters submitted with this Memorandum from family, friends, mentees, neighbors, and community members paint a vivid picture of Suni's good character and life of good deeds as well as indicate that his crime represents an aberration.[39]   The letters describe a man who overcame great childhood adversity to become someone who has had a tremendously positive impact on his community.

Suni is a person who gives himself fully to those in need, frequently helping people survive some of the most stressful moments of their lives.  The letters describe the laudable life Suni has lived, and request that this Court be as lenient as possible when imposing a sentence.[40]  *See Gupta*, 904 F. Supp. 2d at 353–54 (considering the defendant's "history and characteristics" to impose a below-Guidelines sentence); *United States v. Adelson*, 441 F. Supp. 2d 506, 513–14 (S.D.N.Y. 2006) (same); *Lumiere*,  No. 16-cr-483 (JSR), ECF No. 115 at 29:4–11 (taking "very much into account" defendant's "laudable life, one of which he and the many people who are here to support him can be proud").

### 1.    *Suni's Childhood Was Filled With Traumatic Events*

Suni's childhood was difficult.  He was born and raised in a family of modest means in India, where he excelled academically and earned a bachelor's degree in mechanical engineering with honors from the Indian Institute of Technology in Kharagpur, India.[41]

Suni lived in India until he immigrated to the U.S. in 1985 at the age of 24.[42]  He became a naturalized U.S. citizen on August 9, 2002.[43]

---

[39] *See* Exs. A – T.
[40] *Id.*
[41] PSR ¶ 83.
[42] *Id.* ¶¶ 63, 70.
[43] *Id.* ¶ 63.

Suni's relationship with his father was "tough."[44]  He would be physically punished as a child for what his father viewed as "misbehavior", such as playing an extra game of field hockey or not coming home directly after school.[45]  ███████████████████████████████████████

█████████████████████████████████████████████████████████████

██████████████████████

Two particularly traumatic events occurred during Suni's childhood – ████████████  and a fall from the fourth floor of a building.  ███████████████████████████████

███████████████████████████████████  ████████████████████████

██████████████████████████████  █████████████████████████████

██████████████████████████  ███████████████████████████████

████████████████████████

When Suni was 13 years old, he fell from the fourth floor of a building while walking across a parapet from one building to another to retrieve a kite.[51]  While he was falling, Suni's body struck a window which caused his body to turn sideways.[52]  Suni believes this "broke" his fall and saved his life.[53]  However, the impact of the fall nearly "crushed" his windpipe and caused him to suffer internal bleeding, bruising, and infections.[54]  Suni was hospitalized for a period of

---

[44] *Id.* ¶ 66.
[45] *Id*.
[46] *Id*.
[47] *Id.* ¶ 67.
[48] *Id*.
[49] *Id*.
[50] *Id*.
[51] *Id.* ¶ 68.
[52] *Id*.
[53] *Id*.
[54] *Id*.

time and, as a result, he was unable to take his final exams, which resulted in Suni being forced to repeat the entire 7th grade.[55]  It took Suni years to fully recover from this fall.[56]

This Court should consider Suni's childhood trauma as a factor supporting a more lenient sentence.  *See, e.g.*, *United States v. Mays*, 967 F.3d 748, 754 (8th Cir. 2020) (affirming a sentence below-Guidelines where the district court considered "mitigating factors" such as "the impact of [defendant's] childhood"); *United States v. Jodoin*, 816 F. App'x 394, 396–97 (11th Cir. 2020) (stating that the district court gave the defendant a below-Guidelines range after considering, in part, his "childhood difficulties"); *United States v. Mendez-Castro*, 655 F. App'x 115, 118 (3d Cir. 2016) (affirming a sentence less than the applicable Guidelines range where the court considered defendant's abuse as a child).

### 2.  *Suni Has A Strong Network Of Supportive Family Members And Friends*

As the letters submitted with this Memorandum make clear, Suni has an extensive network of family members and friends who are supporting him during this difficult time.[57]  These people are confident that, if given the opportunity to do so, Suni will continue to positively contribute to the community and impact the lives of others.  They praise his enormous heart and his desire to help others and believe Suni has so much more to continue to offer.  *See, e.g.*, *United States v. Butler*, Index Nos. 08-cr-370 (JBW), 11-cr-588 (JBW), 2011 WL 4073672, at *4 (E.D.N.Y. Sept. 13, 2011) (imposing a non-Guidelines sentence "in large part because defendant was 'supported by a large community of family and friends, and a wife and child, who have attested to his good character in written submissions to the court'"); *United States v. Harding*, Index No. 05-cr-1285-02 (RWS), 2006 WL 2850261, at *5 (S.D.N.Y. Sept. 28, 2006) (granting a below-Guidelines

---

[55] *Id.*
[56] *Id*.
[57] *See* Exs. A – T.

sentence because of defendant's "significant network [of family and community members] that is ready to support [the defendant] upon his release from prison"); *United States v. Butler*, 264 F.R.D. 37, 39 (E.D.N.Y. 2010) (imposing a non-Guidelines sentence despite "staggering" losses where defendant's large community of friends and family suggested high probability of rehabilitation).

### i.     *Suni Is a Devoted Husband and Father*

Suni is a devoted family man.  The letters speak to how he is an "attentive family-oriented person", a "doting husband", and an "engaged father" who is immensely proud of his daughter.[58] Family friends have described all three members of the Munshani family as "incredible humans."[59]

Suni and his wife, Tina Gill ("Tina"), have been married for over 26 years and reside in Connecticut.[60]  Tina is an attorney, but she is currently not practicing and is a stay-at-home wife.[61] Letter writers describe Tina as "wonderful" and "remarkably warm and fun."[62]

Tina has described her husband as "positive, generous and dedicated to his family and friends."[63]  "He goes above and beyond in all that he commits to professionally and personally."[64] As a testament to the type of person Suni is, Tina shared that Suni has managed to continue to be a "rock" to her and her daughter even during this difficult past year.[65]  She said, "He has projected strength and courage for our benefit.  We are able to weather this storm because we see him forging forward, continuing to be our cheerleader, and still giving us the best of him on a daily basis."[66] She also expressed how supportive Suni has been since her father suffered a stroke in

---

[58] Ex. B, Yves Berliet letter to the Court; Ex. C, Reiko Fitzsimonds letter to the Court; Ex. D, Gary Reiner letter to the Court; Ex. E, Tom Bruderman letter to the Court.
[59] Ex. F, Andrea Pirrotti-Dranchak letter to the Court.
[60] PSR ¶¶ 71, 73.
[61] *Id*. ¶ 71.
[62] Ex. B (Yves Berliet); Ex. D (Gary Reiner).
[63] Ex. G, Tina Gill letter to the Court.
[64] *Id*.
[65] *Id*.
[66] *Id*.

October 2022, which has required Tina to spend a lot of time since then in Georgia, where her father resides.[67]  Tina noted, "For me, that is testament to his dedication to his family; he thinks of our needs before his."[68]

Suni's daughter, Saira Munshani ("Saira"), is his pride and joy.  Saira is 21 years old and currently attends the University of Chicago.[69]  She is double majoring in Chemistry and Philosophy, and hopes to pursue an MD-PhD degree after graduation.[70]  Suni and Tina have done a great job raising Saira, who is described by those knowing her as a "remarkable", "terrific", "incredibly smart, curious, motivated," "fun", "brilliant", "educated, and giving human."[71]  Suni has always had a very close relationship with Saira and played an active role in her upbringing and education.  As his wife noted, "[f]rom the day she was born, he has been involved in her upbringing and care.  He has always put aside any outside commitments to listen to her, advise her and comfort her.  He has changed diapers, attended every cello recital and has encouraged her to pursue her passions.  Simply put, he is steadfast in her corner and has never wavered from his role as a father to love, guide, and protect her."[72]  Suni's friends similarly note that he "is deeply devoted" to Saira, commenting that "[t]here is nothing he wouldn't do for her.  When she calls, he will drop whatever he is doing.  When she visits, he is 100% focused and attentive to her."[73]

As Saira writes in her letter to the Court, her father has been her "biggest cheerleader" and "has been willing to do absolutely anything for me."[74]  Saira is thankful that Suni has always

---

[67] *Id*.
[68] *Id*.
[69] PSR ¶ 72.
[70] Ex. H, Saira Munshani letter to the Court.
[71] Ex. D (Gary Reiner); Ex. F (Andrea Pirrotti-Dranchak); Ex. I, Chris Kraus letter to the Court.
[72] Ex. G (Tina Gill).
[73] Ex. D (Gary Reiner).
[74] Ex. H (Saira Munshani).

showed up when it mattered the most, and considers him to be "the most reliable person" she knows.[75]  Saira credits her father with teaching her so much "about the importance of habits, work ethic, and grit."[76]  She said that, "He made me feel like the sky was the limit and that I could achieve anything."[77]  Saira says that her father is "a genuine person with a soft heart."[78]  She describes him as "a vibrant mix of unconditional love for his family, passions for cooking and videography, [and] endless dedication to his friends. . . . He is always changing, always growing, and always trying to be better than he was the day before."[79]

Suni's friends have echoed Tina and Saira's sentiments that Suni is a great faither.[80]  They respect the "meaningful, well-rounded, well-grounded value-based upbringing" that Suni and his wife have provided Saira.[81]

Suni's friends have expressed that his devotion to family extends beyond his own.  They have commented how thankful they are that Suni, "as a parent, [] has provided [them with] guidance and support that simply can't be replicated as we help our children with their academic, athletic, and developmental journal."[82]  They also describe how Suni has had a "very positive influence" on their own children – "especially encouraging the[ir] [children] to believe in their ability to do great things in life" and give "sky-is-the-limit positive inspirational talks" to them.[83]

Suni's absence will leave a gaping hole in the lives of his tight-knit family and have a profoundly adverse impact on his wife and daughter.  Tina "loves and relies on Suni" and he is

---

[75] *Id*.
[76] *Id*.
[77] *Id*.
[78] *Id*.
[79] *Id*.
[80] Ex. B (Yves Berliet); Ex. F (Andrea Pirrotti-Dranchak); Ex. J, Paul Dunay letter to the Court.
[81] Ex. B (Yves Berliet).
[82] Ex. F (Andrea Pirrotti-Dranchak).
[83] Ex. C (Reiko Fitzsimonds); Ex. K, Patrick Fitzsimonds letter to the Court.

very close with his daughter Saira.[84]   Suni's actions have already "brought damage, pain and suffering to his wonderful supporting wife Tina and bright daughter Saira."[85]

### ii.   *Suni Has Helped Many People Through The Years*

The letters paint a consistent portrait of Suni as "thoughtful," "a life changing blessing", and a "valued friend."[86]   Madhav Dhar wrote that "Suni is compassionate, energetic, enthusiastic, an amazing dad, an extraordinary friend, a curious intellect, an outstanding chef, a generous host, an entertaining guest, a serial optimistic entrepreneur, and a self reflective and forthright human being."[87]

Suni's friends share the sentiment that he is "encouraging," "thoughtful," and "always generous with his time, offering a helping hand, or providing thoughtful insight."[88]   Andrea Pirrotti-Dranchak, the Global Enterprise Director for NewFlex and President of the Fairfield Ludlowe High School PTA, explained to the Court, "On a personal level, every single time my husband and I have reached out to Suni for support he has been there for us – without fail."[89]

These letters describe someone who goes out of his way, repeatedly, to give his time and energy to help others.   Suni is "a man of extraordinary energy, focus, enthusiasm, sustained caring and empathy – a true example of a true friend in need – always there, always available.   No questions, no apologies, no excuses."[90]   "He is a person who respects human values, someone who gives without asking anything in return."[91]

---

[84] Ex. D (Gary Reiner); Ex. L, Sanju Bansal letter to the Court.
[85] Ex. B (Yves Berliet).
[86] Ex. E (Tom Bruderman); Ex. L (Sanju Bansal); Ex. M, Caitlin Villarreal letter to the Court.
[87] Ex. N, Madhav Dhar letter to the Court.
[88] Ex. E (Tom Bruderman); Ex. J (Paul Dunay).
[89] Ex. F (Andrea Pirrotti-Dranchak).
[90]Ex. N (Madhav Dhar).
[91]Ex. O, Alexander Heidl letter to the Court.

Suni's friends value his "kindness" and repeatedly describe him as a "compassionate," "creative, caring person" with "a terrific sense of humor" who "is always willing to share his wealth of knowledge to help and to enhance lives."[92]

It is difficult to summarize all the letters that have been provided to the Court, but one example illustrates his generosity.

Reiko Fitzsimonds, Associate Director for Program Development and Assessment in the MD-PHD Program and Associate Professor Adjunct of Cellular & Molecular Physiology at the Yale School of Medicine, and Patrick Fitzsimonds, a retired banker and banking regulator, moved to Puerto Rico with their 3 children and 2 dogs.[93]  Their home was very badly damaged when Hurricanes Irma and Maria devastated the island in 2017.[94]  In the midst of this natural disaster, the Fitzsimonds said that "[o]f all of our friends, no one checked on our status more than Suni."[95] They explained that the island lost power and they had difficulty figuring out "where to go, how to get food and water, etc." during this extreme circumstance when "[p]eople were being robbed at gunpoint for fuel and food" and island friends were already burdened with trying "to figure out how to care for their own extended family members displaced by the hurricane."[96]  They had no way to communicate with airlines, hotels, and real estate people as they only had a few minutes of cell signal per day.[97]  When they needed help, Suni "took ownership of [their] rough situation and leapt into the breach."[98]  Suni reached out to them to tell them he had a plan:  he was going to find

---

[92] Ex. D (Gary Reiner); Ex. F (Andrea Pirrotti-Dranchak); Ex. L (Sanju Bansal); Ex. P, Judith Keane letter to the Court.
[93] Ex. C (Reiko Fitzsimonds); Ex. K (Patrick Fitzsimonds).
[94] *Id.*
[95] Ex. C (Reiko Fitzsimonds).
[96] *Id.*
[97] Ex. K (Patrick Fitzsimonds).
[98] *Id.*

a way to get the entire Fitzsimonds family to Connecticut where they could stay in his house, "indefinitely, while [they] unwound from the trauma and figured out how to put [their] lives back together."[99]

Mrs. Fitzsimonds gratefully recalled, "Before Suni called, we had no idea where we could go to live or send our children to school.  After getting back to the mainland, Suni doted on us every day to make sure we had everything we could possibly need."[100]  "Looking back, I cannot adequately describe the depth of Suni's generosity, patience and empathy for our family at a time of extraordinary need.  We are forever indebted to Suni for giving us safe haven during the most traumatic and dire circumstances of our lives."[101]

Suni's friends noted in their letters to the Court how "shocked", "surprised, upset and disappointed" they felt when he told them about his indictment and what they consider to be "an out of character fraud."[102]   Suni's friends shared how they are "humbled by the fact that he makes no excuses for any of the transgressions and remorsefully accepts responsibility."[103]   They feel like he "truly laments the mistakes he has made[,] regrets the errors in judgment that have brought him to this place", "is deeply remorseful and has been working hard to make amends."[104]

Madhav Dhar surmised, "In our several tough conversations since the allegations surfaced, he gamely took responsibility for his actions and apologized to his family and to his closest friends who are stunned, hurt, angry, and shaken by his actions. Suni knows there are no excuses for his actions that have upended his life and shattered his family and friends. Characteristically though,

---

[99] Ex. C (Reiko Fitzsimonds).
[100] *Id.*
[101] *Id.*
[102] Ex. B (Yves Berliet).
[103] Ex. B (Yves Berliet); Ex. E (Tom Bruderman).
[104] Ex. B (Yves Berliet).

he has admitted guilt, taken full responsibility and is determined to cooperate with the justice system completely. He remains determined and focused on rehabilitating and restoring himself back into the community and to his family and friends, and that the better angels of his nature will guide and propel the remaining years of his life."[105]  Mr. Dhar further elaborated, "His attitude, especially over the past six months has been truly remarkable – repentant, constructive, positive, and hopeful."[106]

Suni enjoys helping others and recognizes that this is something he will be able to continue to do after he has served his sentence.  He respectfully requests that this Court consider all of the good things he has done for others when imposing his sentence.  *See, e.g.*, *Gupta*, 904 F. Supp. 2d at 354 (considering the defendant's "extraordinary devotion . . . to individual human beings in their times of need" as a factor in imposing a sentence); *Little*, Index No. 17-cr-450 (KPF) (S.D.N.Y. April 5, 2018), ECF 59 at 68:18–69:1 (considering the "good things they have done for people, or people to whom they mattered, and people to whom they provided a benefit or positive influence on their lives" as mitigating factors for a defendant's below-Guidelines sentence).

### 3.   Suni Is An Active Volunteer

Suni also is dedicated to helping the broader community.  He has volunteered to assist various institutions and groups, including the Levitt Pavilion, a performing arts center in Westport, Connecticut.[107]

Suni has devoted substantial time and energy to Manhattan College.  He served as an unpaid member of Manhattan College's Board of Trustees from 2017 until 2022.[108]  He was the

---

[105] Ex. N (Madhav Dhar).
[106] *Id.*
[107] Ex. L (Sanju Bansal); Ex. N (Madhav Dhar); Ex. Q, Brother Jack Curran letter to the Court; Ex. R, Darcy Stacom letter to the Court.
[108] PSR ¶ 91.  Suni resigned from the Board of Trustees after he was arrested.

only member of the board that was not a former graduate of the college.[109]  Suni made important contributions as a trustee.[110]  Brother Jack Curran, Vice President for Mission at Manhattan College, describes Suni as "keen to offer problem-solving insights" and "interest[ed] in and support[ive] of the values-based mission of the College."[111]  Brother Curran said that he felt "truly blindsided and astounded by both the charges and [Suni's] guilty plea because this is not the man I know.  The Suni Munshani I know did not exhibit any of the traits usually associated with these types of crimes.  He did not spend lavishly in my presence and did not suggest an opulent lifestyle. In fact, in my interactions with him, he was much the opposite.  I found him to be a caring and compassionate person interested in the well-being of others, especially those who may have experienced hardships and setbacks due to circumstances beyond their control."[112]  Brother Curran stated that Suni is "a good and decent man" and he expressed his belief that Suni's breach of his employer's trust "does not define his life, just as one episode does not define any of us."[113]

Suni's contributions to the community are factors the Court should consider in fashioning a sentence.  *See, e.g*, *Little*, Index No. 17-cr-450 (KPF) (S.D.N.Y. April 5, 2018), ECF 59 at 69:1–5 (considering the "many good things" the defendant had done for a non-profit); *United States v. Huntley*, 961 F. Supp. 2d 409, 414 (E.D.N.Y. 2013) (considering a defendant's "participat[ion] in a number of charitable works and volunteer jobs" as a factor in imposing a sentence below the GSR).

---

[109] *Id.*
[110] *Id.*
[111] Ex. Q (Brother Curran).
[112] *Id.*
[113] *Id.*

### 4.    *Suni Is A Trusted Mentor Who Has Guided Mentees From Various Walks Of Life*

Suni has spent his career working in the field of software services and distribution.[114]  He has used his education and professional acumen to lead and found businesses as well as to be "a mentor and supporter to many others."[115]

Suni has mentored many people from various walks of life, including aspiring artists, business leaders, entrepreneurs, his daughter's classmates, and neighbors.[116]  Those that have observed him mentor others have commented that he "is a man with enormous ability to bring skilled and talented people together to achieve their potential in their future ventures.  [He is] always looking for ways to develop their talent, to add to their lives."[117]  His mentees describe how Suni has enabled many "to flourish in their personal and professional lives" and how they appreciate "the jobs he enabled or the directions he gave when one was at a fork in their careers or personal paths."[118]

Suni's mentees sing his praises and are thankful that he has been in their "corner" professionally and that , "come rain or shine[,] . . . [Suni] has always been supportive and available to help."[119]  They describe him as a "confidante," a "trusted advisor", "empathetic and thoughtful, soulful and passionate, communicative and supportive," "a born leader" who "is great at attracting and nurturing talent" as "people respond to his humanity, curiosity, and intellect."[120]

Suni has helped established business professionals and budding entrepreneurs alike.  Gary Reiner, a partner at private equity firm General Atlantic, commented how he has "had numerous

---

[114] PSR ¶ 90.
[115] Ex. N (Madhav Dhar).
[116] Ex. F (Andrea Pirrotti-Dranchak).
[117] Ex. B (Yves Berliet).
[118] Ex. O (Alexander Heidl).
[119] Ex. J (Paul Dunay); Ex. S, Aditya Ahuja letter to the Court.
[120] Ex. L (Sanju Bansal); Ex. M (Caitlin Villarreal).

24

business and personal challenges where [he has] sought [Suni's] advice and found it incredibly helpful."[121]  He explained that, "Unlike many others, [Suni] doesn't provide advice that will justify his own decisions but instead consider[s] only what will be best for his friend."[122]

Caitlin Villarreal, a young queer entrepreneur, shared how "Suni has impacted [her] professional and personal growth in ways no one else has since meeting them."[123]  She said that she attributes the person she has evolved into today to her meeting and becoming friends with Suni at a time when her "professional confidence was completely shattered," explaining that Suni "is the first person who recognized [her] true potential" and that he "tirelessly empowered and encouraged [her] to achieve what previously [] felt out of [her] reach."[124]  Ms. Villarreal expressed her gratitude to Suni for serving as her mentor, commenting that, "Suni did not just invite me to sit at an existing leadership table beside him, but rather showed me the tools and steps that I need to form a leadership team from scratch and fill it with individuals selected by me."[125]

Alexander Heidl, Founder & CEO of OriginML, a young company involved in machine learning compliance, expressed that he "had an immediate connection" with Suni from the moment he shook his hand and that connection "grew via mentorship to a true friendship over the past 11 years."[126]  Mr. Heidl wrote about how Suni "has been coaching me to grow into a better version of myself every other day.  Whether this was with customer accounts, project managing, developing leadership skills, striving in intercultural environments, decision making, etc. – Suni

---

[121]Ex. D (Gary Reiner).
[122] *Id.*
[123] Ex. M (Caitlin Villarreal).
[124] *Id.*
[125] *Id.*
[126] Ex. O (Alexander Heidl).

Munshani has never turned me down when I have asked for advice and he has always shared his experience in a manner that helped me to deal with the professional situations I was facing."[127]

### C.   The Proposed Sentence Is Sufficient, But Not Greater Than Necessary, To Promote Respect For The Law and Afford Adequate Deterrence

18 U.S.C. § 3553(a) requires the Court to consider whether a sentence would "promote respect for the law" and "afford adequate deterrence to criminal conduct."  The sentence Suni proposes would do both.  As this Court previously has explained, "the main issue in white-collar cases is often general deterrence, and there is a body of literature largely ignored by the sentencing commission but which suggests that, on the one hand, heavy sentences do not serve added deterrent effect in white-collar cases, but that, on the other hand, some meaningful prison time does serve a major deterring effect in white-collar cases because it sends the message to others similarly situated that you can't buy your way out of this." *Lumiere*, No. 16-cr-483 (JSR) (S.D.N.Y. June 27, 2017), ECF No. 115 at 15:1–9.

Nobody looking at Suni's situation would think he "got away with anything" if he were sentenced to 18 months imprisonment, 24 months supervised release, and a restitution obligation of $10,485,043.  Suni has suffered and will continue to suffer devastating professional, financial, and personal collateral consequences.  His liberty will be severely restricted, his career has been destroyed, his reputation is in tatters, and he will spend the rest of his life trying to satisfy his restitution obligations.  Suni will also have a difficult time finding employment.

"There is [] considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders." *Adelson*, 441 F. Supp. 2d at 514.  A sentence of 18 months imprisonment would not be "relatively short", and would send a clear

---

[127] *Id.*

message that this type of crime will result in substantial punishment.  A longer custodial sentence would be greater than necessary to deter similarly-situated potential wrongdoers.

In terms of specific deterrence, Suni certainly has gotten the message and, as the Probation Officer states, poses a very low risk of recidivism.[128]  *See also* Tracey Kyckelhahn & Trishia Cooper, U.S. SENTENCING COMM'N, *The Past Predicts the Future: Criminal History and Recidivism of Federal Offenders*, at 6-9 (Mar. 2017), *available at*: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170309_Recidivism-CH.pdf (stating that first time offenders are at low risk of reoffending).

### D.    No Purpose Would Be Served By Incarcerating Suni For More Than 18 Months

Incarceration obviously imposes great burdens on a defendant, his family, and his friends. Imprisoning defendants is also expensive.  Based on fiscal year 2020 data, the average annual cost of incarceration for a federal inmate in a federal facility was $39,158.[129]  Suni's complex medical needs suggest that the actual cost of his incarceration will be much greater.  Suni is a non-violent and first-time offender.  Locking him up for more than 18 months would advance no public purpose, and would serve to limit Suni's ability to pay restitution.

---

[128] PSR at p. 28.
[129] "Annual Determination of Average Cost of Incarceration Fee", A Notice by the Prisons Bureau on 9/1/202, 86 Fed. Reg. 49060, *available at*: https://www.federalregister.gov/documents/2021/09/01/2021-18800/annual-determination-of-average-cost-of-incarceration-fee-coif.

### E.      Suni Poses No Future Threat To The Public

Suni poses no future threat to the public.  Indeed, the PSR notes that "his risk of recidivism would appear to be low."[130]   To the contrary, the letters describe a man who benefits the community:

- "I have known Suni to be a truly exemplary person and boon to our small community where he is widely known and well-liked personality."[131]

- "Mr. Munshani is always willing to help anyone in need, welcoming them into his home, or generously offering them counsel or possessions."[132]

- "He's not the type of person who should be in jail" and it would be a "waste of human potential" for him to be incarcerated.[133]

- "Simply put, Suni has made a world of difference in my life and has had a similar profound impact on the lives of many others."[134]

- "[A]s a neighbor of [Suni] of nearly 30 years…I have found him to be a thoughtful and caring neighbor.  He has always been quick to offer his assistance to my family whenever the need has arisen…I would ask that to the extent he has demonstrated himself over many years to be a kind, caring and thoughtful member of our neighborhood, that behavior also be recognized."[135]

- "At the time our town was voting to replace a bridge that washed away Suni did the right thing and helped organize people to attend meetings and prevent a two lane

---

[130] PSR at p. 28.
[131] Ex. C (Reiko Fitzsimonds).
[132] Ex. E (Tom Bruderman).
[133] PSR ¶ 75 (quoting Tina Gill).
[134] Ex. S (Aditya Ahuja).
[135] Ex. I (Chris Kraus).

monstrosity where one lane would serve…Our experience with Suni is clear.  He has been a straightforward member of the community and family man.  He is a great neighbor."[136]

- "My hope is that as you consider sentencing you will take a holistic view of Suni's life and not allow this one instance to define him.  I ask that you consider his contribution to society as a committed father, an innovator, a philanthropist, advisor, and friend to many."[137]

## IV.   SUNI'S COOPERATION WITH LAW ENFORCEMENT

In connection with the prosecution of his brother, Suni cooperated with the government by voluntarily providing access to his laptop.  Evidence from the laptop was introduced at trial. AUSA Capozzi characterizes Suni's cooperation as helpful in connection with the government's successful prosecution of Suresh Munshani.  While this cooperation did not result in the filing of a motion under U.S.S.G. § 5K 1.1, it is nonetheless a factor that can be considered by the Court when imposing a sentence.  *See, e.g., United States v. Barquet*, 504 F. App'x 34, 36 (2d Cir. 2012) (affirming sentence where "the district court imposed a below-Guidelines sentence to reflect[ ] the help that [defendant] gave the government", even in the absence of a 5K 1.1 motion) (alterations in original) (internal citations omitted); *United States v. Moore*, 344 F. App'x 767, 769 (3d Cir. 2009) (affirming below-Guidelines sentence where defendant cooperated, but cooperation did not result in a 5K 1.1 motion).

## V.   THE CIRCUMSTANCES OF THE CRIME

When Suni joined Protegrity in 2011, it was a small company with less than $1 million in recurring revenue and approximately 60 employees.  The company grew substantially during

---

[136] Ex. R (Darcy Stacom).
[137] Ex. F (Andrea Pirrotti-Dranchak).

Suni's tenure:  when he left in 2019 its recurring revenue had grown to approximately $35 million and the company's workforce had grown to more than 300 employees and consultants.

To be clear, Suni's role in growing Protegrity in no way excuses his criminal conduct.  He was a skilled CEO who made contributions to Protegrity even as he executed a scheme to victimize it.

Shortly after joining Protegrity, Suni became concerned about whether he would be fully compensated for his work.  He did not trust Alexander Vik, one of the principal shareholders of Protegrity's parent company, Xcellera, Inc, to fulfill promises made to him.  Suni's criminal conduct began thereafter.  There is no excuse for what he did, and rather than engaging in crimes against Protegrity, he should have simply left the Company.  He acknowledges that his distrust of Vik was not a justification for his crimes.[138]

## VI.    THE PROPOSED SENTENCE IS SUFFICIENT, BUT NOT GREATER THAN NECESSARY, TO ACHIEVE THE GOALS OF SENTENCING

The sentence in this case can be no more than the statutory maximum for violations of 18 U.S.C. § 371, 5 years imprisonment.  Such a sentence, however, would be much greater than necessary to achieve the goals of sentencing.

Considering all of the relevant factors under Section 3553, *supra*, the Court should impose a sentence of 18 months imprisonment, 24 months supervised release, and restitution in the amount of $10,485,043.  This proposed sentence would be "sufficient, but not greater than necessary" to comply with the purposes of Section 3553(a)(2), including to demonstrate "the seriousness of the offense," to promote "respect for the law," to provide a "just punishment for the offense," and to

---

[138] Suni's concerns about Vik were shared by others.  The United Kingdom Court of Appeals dismissed an appeal brought by Vik challenging a contempt finding and 20-month sentence arising from Vik giving false evidence as to the debts of a company he controlled and failing to produce documents that he had been ordered to produce.  *See Deutsche Bank AG v. Sebastian Holdings Inc.*, [2023] EWCA Civ 191.

adequately deter Suni and members of the general public from committing further crimes.  *See Gupta,* 904 F. Supp. 2d at 350–353 (imposing 24-month sentence in spite of a GSR of 78-97 months after acknowledging that loss figure "overwhelm[ed] all other factors" and thus the GSR did not account for Section 3553 factors); *Lumiere,* Index No. 16-cr-483 (JSR) (S.D.N.Y. June 27, 2017), ECF No. 115 at 29:4–11 (imposing 18-month sentence in spite of GSR of 87-108 months, particularly focusing on otherwise "laudable life" and health issues as factors supporting leniency); *Adelson,* 441 F. Supp. 2d at 512–15 (imposing 42 month sentence rather than GSR of life imprisonment in securities fraud case, "citing "exemplary" past history and devotion to family and friends).

## VII.   CONCLUSION

Suni is deeply remorseful for his crime.  He recognizes that he deserves to be punished for what he did.  18 U.S.C. §3553(a) calls for the Court to impose a sentence that is "sufficient, but not greater than necessary" to serve the purposes of sentencing.  The sentence he proposes – 18 months imprisonment, 24 months supervised release, full restitution in the amount of $10,485,043, no fine,[139] forfeiture in the amount of $6,590,971, and a $100 special assessment fee would appropriately balance the sentencing factors in Section 3553.

Suni asks that he be permitted to self-surrender in 90 days, which would enable him to attend scheduled physician appointments and potentially enable his physicians to determine an appropriate course of treatment.  He requests a judicial recommendation that he serve the custodial

---

[139] Probation also recommends imposing no fine.  PSR at pp. 27-28, 33.  Suni lacks the ability to pay a fine, *id.* at p. 33, and his future earnings should be earmarked for paying his restitution obligation.  *Id.*

portion of his sentence at FCI-Devens in Ayer, Massachusetts, both because of its proximity to his family and its location next to the Federal Medical Center at Devens.

Dated:  March 31, 2023                     Respectfully submitted,


                                           Suni Munshani,
                                           By his attorneys,


                                           MCDERMOTT WILL & EMERY LLP


                                            /s/ Mark W. Pearlstein
                                           Mark W. Pearlstein (*Admitted Pro Hac Vice*)
                                           200 Clarendon Street, Floor 58
                                           Boston, MA 02116-5021
                                           E-mail: MPearlstein@mwe.com
                                           Telephone: (617) 535-4425


                                           J. Greer Griffith
                                           One Vanderbilt Avenue
                                           New York, NY 10017
                                           E-mail:  GGriffith@mwe.com
                                           Telephone: (212) 547-5578

                                           *Attorneys for Defendant Suni Munshani*