

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

March 31, 2023

**BY ECF**

The Honorable Jed S. Rakoff
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

  Re: *United States v. Suni Munshani*, S1 22 Cr. 215 (JSR)

Dear Judge Rakoff:

  The Government respectfully submits this letter in advance of the sentencing of Suni Munshani (the "defendant") on April 7, 2023. Over the course of approximately eight years, the defendant brazenly stole over $10 million from a data security company (the "Victim Company") that entrusted him as its Chief Executive Officer ("CEO"). But for the applicable statutory maximum of 60 months' incarceration, the sentencing range under the United States Sentencing Guidelines (the "Guidelines") for the defendant's longstanding, varied, and egregious misconduct would have been 87 to 108 months' imprisonment. The Probation Office recommends a sentence equal to the statutory maximum. For the reasons set forth below, the Government agrees that such a sentence would be sufficient, but not greater than necessary, to achieve the goals of sentencing.

**A.** **Background**

  **1.** **Offense and Relevant Conduct**

  Between 2011 and 2019, the defendant was the CEO of the Victim Company, which provided data security services to its clients. (Presentence Investigation Report ("PSR") ¶ 10). Within six months of his appointment as CEO and continuing until his separation from the company about eight years later, the defendant and his co-conspirators used the Victim Company to fraudulently enrich themselves, causing losses to the Victim Company of at least $10,485,043. (PSR ¶ 36). The defendant's criminal methods were manifold.

  **i.** **The Third-Party Contractor and Purported Tax Liability**

  The defendant used his deceased uncle's identity to steal millions through fraudulent payments to a fake contractor and for a purported tax liability (the "Fake Contractor and Purported Tax Liability Conduct"). (*See* PSR ¶¶ 11-18). In service of this aspect of the fraud, the defendant created an email account in the name of his uncle, Chandru Badlani, and then used that account to cause the Victim Company to enter into fraudulent contracts with a company that was purportedly

controlled by Badlani (called "CLB Associates" or "CBL Associates") but in fact was a fiction devised by the defendant.[1] (*See* PSR ¶¶ 11-14). The defendant, posing as Badlani, wrote over 50 emails from the fraudulent email account to Victim Company email accounts, the vast majority of which he wrote to his own work email account. In the emails, the defendant, among other things, "negotiated" the fraudulent contracts with himself and submitted invoices to the Victim Company for services that were never provided. (*See* PSR ¶¶ 13-14). The emails and invoices claimed, among other things, that the services had been rendered by Badlani and others, including a marketing executive who had met the defendant in social settings but had never worked for the defendant or the Victim Company and had no idea his identity was being used by the defendant. (*See United States v. Suresh Munshani*, Trial Transcript ("Tr.") 37, 76-78, 90-96; Government Exhibit ("GX") 159; Defense Exhibits 107, 108).

Between 2011 and 2018, the defendant caused Protegrity to pay at least $3,030,971 to Badlani and Badlani's company. (*See* PSR ¶¶ 15). Most of these funds were deposited into a bank account held by the defendant in the name of Badlani. (*Id.*). However, when the bank closed that account around January 2015, the defendant enlisted his brother, Suresh Munshani, to keep the scheme going. (*Id.*). After meeting with the defendant, Suresh Munshani registered a company in the name of Badlani's company and added that company name to a bank account he held in Canada. (*Id.*). Thereafter, between March 2015 and September 2018, the defendant caused the Victim Company to issue at least four checks to Badlani's company that were deposited into Suresh Munshani's account. (*Id.*). For three of the four checks, after the Victim Company's funds were deposited into Suresh Munshani's account, Suresh Munshani transferred most of the funds to the defendant, and kept a portion for himself. (PSR ¶ 16).

The defendant, again with the assistance of Suresh Munshani, also stole $3.5 million that he claimed related to a tax liability of the Victim Company. (PSR ¶¶ 17-18). To execute this aspect of the scheme, in May 2015, the defendant caused the Victim Company to issue a $3.5 million typed check to the Victim Company for the purported liability. (PSR ¶ 17). The defendant deposited the check, which he signed on behalf of the Victim Company, into an unauthorized bank account that he opened in the name of the Victim Company. (*Id.*). Thereafter, the defendant transferred the stolen money to other bank accounts controlled by him and his brother. (PSR ¶ 18). To provide cover for this aspect of the fraud, the defendant signed a never-negotiated handwritten $3.5 million check from the Victim Company to the Internal Revenue Service, a copy of which was kept in the Victim Company's files. (*See* PSR ¶ 17; Tr. 423-26; GX 110).

Of the $6,530,971 stolen through this aspect of the fraud, the defendant kept approximately $6,380,971, with the remaining $150,000 going to Suresh Munshani.

    ii.    **The Licensing and Reseller Companies**

Toward the end of his tenure as CEO, the defendant and others also defrauded the Victim Company through fraudulent licensing and reseller agreements between the Victim Company and two other companies (the "Licensing Company" and the "Reseller Company," respectively). (*See*

---

[1] The Victim Company and its employees were unaware that the defendant had an uncle named Chandru Badlani.

PSR ¶¶ 19-26).  In service of this aspect of the fraud (the "Licensing and Reseller Companies Conduct"), the defendant surreptitiously used his personal email account to coordinate the creation of the companies and then assisted those companies in contract negotiations with the Victim Company.  (*See id.*).  Thereafter, he attempted to steer an approximately $6.7 million contract to the Licensing Company and away from the Victim Company.  (PSR ¶ 21).  After that fell through, he helped the Reseller Company get paid by the Victim Company at least $531,120 for software sales to companies that were identified as potential customers by the Victim Company before the Reseller Company even existed.  (PSR ¶¶ 23-26).  At least $140,000 of this amount was transferred to the defendant.  (PSR ¶ 26).

### iii.    The Development Company

Between 2013 and 2019, the defendant also fraudulently enriched himself and others through services agreements between the Victim Company and a software development company located in India (the "Development Company Conduct").  (PSR ¶¶ 27-34).  Around the same time that he used his personal email account to surreptitiously assist the CEO of the Development Company in negotiating a contract with the Victim Company, the defendant, unbeknownst to the Victim Company, negotiated a 50 percent ownership interest for himself in the Development Company, which interest was held in trusts in the names of his father and then mother.   (PSR ¶ 30).  After gaining his ownership interest in the Development Company, the defendant and the Development Company's CEO doubled the management fee paid by the Victim Company from 25 percent to 50 percent, which resulted in losses to the Victim Company of at least $3,422,952.  (PSR ¶¶ 29, 31-34).  Between in or around July 2016 and in or around 2019, the Development Company transferred, via wires and checks, at least approximately $2 million to a bank account for which the defendant was the sole signatory.  (PSR ¶ 33).

### 2.    Procedural History

On April 11, 2022, a grand jury sitting in this District returned an indictment that charged the defendant with three counts of wire fraud conspiracy, in violation of Title 18, United States Code, Section 1349.  (ECF No. 1).  Count One concerned the above-described Fake Contractor and Purported Tax Liability Conduct.  Count Two concerned the above-described Development Company Conduct.  Count Three concerned the above-described Licensing and Reseller Companies Conduct.  The defendant was arrested on April 13, 2022, and presented before Magistrate Judge Ona T. Wang the same day.

### 3.    The Plea Agreement and the Stipulated Guidelines Sentence

On December 9, 2022, the defendant waived indictment and pleaded guilty, pursuant to a plea agreement (the "Plea Agreement"), to a one-count superseding information (the "Information"), which charged him with a dual-object conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 371. (ECF No. 37).  The first object concerned the Fake Contractor and Purported Tax Liability Conduct.  The second object concerned the Licensing and Reseller Companies Conduct. Pursuant to the Plea Agreement, the defendant agreed that loss to the Victim Company of $3,422,952 resulting from the Development Company Conduct is properly included in the calculation of the applicable sentencing range under the Guidelines and further agreed to pay that amount in restitution, along with restitution of $7,062,091 arising from

the Fake Contractor and Purported Tax Liability Conduct and the Licensing and Reseller Companies Conduct.

In the Plea Agreement, the parties stipulated that, but for the 60-month statutory maximum, the applicable sentencing range under the Guidelines would be 87 to 108 months' incarceration. Because of the statutory cap, the parties stipulated that the applicable sentence under the Guidelines is 60 months' imprisonment (the "Stipulated Guidelines Sentence"). The PSR contains the same Guidelines calculation as that set forth in the Plea Agreement. (PSR ¶¶ 44-55, 98).

As part of his Plea Agreement, the defendant agreed to pay restitution of $10,485.043, which amount is based on losses arising from the above-described Fake Contractor and Purported Tax Liability Conduct, Licensing and Reseller Companies Conduct, and Development Company Conduct.[2] The Government anticipates preparing a proposed restitution order. The defendant also consented to forfeiture of $6,590,971, and the Court signed a consent preliminary order of forfeiture in this amount at the time of the defendant's guilty plea. (ECF No. 33).

**B.     Discussion**

   **1.     Applicable Law**

The Guidelines still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). The Guidelines range is thus "the lodestar" that "'anchor[s]'" the district court's discretion. *Molina-Martinez v. United States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Peugh v. United States*, 133 S. Ct. 2072, 2087 (2013)).

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); (2) the four legitimate purposes of sentencing, as set forth below, *see id.* § 3553(a)(2); (3) "the kinds of sentences available," *id.* § 3553(a)(3); (4) the Guidelines range itself, *see id.* § 3553(a)(4); (5) any relevant policy statement by the Sentencing Commission, *see id.* § 3553(a)(5); (6) "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and (7) "the need to provide restitution to any victims," *id.* § 3553(a)(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

---

[2] In its statement, the Victim Company requests additional restitution, including for certain compensation paid to the defendant, use of company funds for personal expenses, and legal and vendor fees and costs incurred in support of the Government's investigation and prosecution of the defendants in this case.

      (B)    to afford adequate deterrence to criminal conduct;
      (C)    to protect the public from further crimes of the defendant; and
      (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). To the extent that a district court imposes a sentence outside the range recommended by the Guidelines, it must "consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting *Gall*, 552 U.S. at 50) (internal quotation marks omitted).

### 2. The Stipulated Guidelines Sentence Is Appropriate

The Government respectfully submits that a sentence of 60 months' imprisonment would be just. In particular, such a sentence is called for by the nature and circumstances of the offense; the history and characteristics of the defendant; and the need for the sentence to promote respect for the law, provide adequate punishment, and provide deterrence.

*First*, the defendant's offense was extremely serious, as is reflected by the duration of the crime (approximately eight years), the amount stolen (over $10 million), the means of the crime (involving theft of multiple identities, fraudulent email accounts, scores of fraudulent documents, and sham bank accounts), and the fact that the defendant not only abused the trust of his employer and his subordinates at the Victim Company but also directed others in furtherance of the fraud. The defendant's actions in carrying out the fraud were far from a one-time mistake or a fleeting lapse in judgment—it was a sustained and sophisticated looting that involved years of deceit. Furthermore, as detailed in the statement filed by the Victim Company, the defendant's conduct has caused financial harm, significant disruption, and serious reputational risk to a relatively small company.[3]

*Second*, the sentence requested herein is necessary to reflect the history and characteristics of the defendant, promote respect for the law, and provide adequate punishment. Unlike many defendants who appear before this Court, the defendant, who received an annual salary of at least $500,000, owned multiple homes, drove a luxury vehicle, and was a member of a yacht club, enjoyed significant financial stability and comfort as a well-educated, intelligent, and charismatic professional. But it wasn't enough. Despite his success and financial security, the defendant chose to use his skills to engage in a sophisticated fraud. As he admitted in his interview with the Probation Office, this was a crime driven by greed, not necessity. (PSR ¶ 41).

*Third*, the need for general deterrence is acute in this case. One of the paramount factors that the Court must consider in imposing sentence under Section 3553(a) is the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). Courts have generally recognized that "white collar crime . . . requires heavy sentences to deter because

---

[3] Counsel for the Victim Company has advised the Government that they would like the opportunity at sentencing to address the Court on behalf of the Victim Company.

it is potentially very lucrative." *United States v. Hauptman*, 111 F.3d 48, 52 (7th Cir. 1997). "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *Id*. This Court's sentence of the defendant should send a strong and clear message to others that sophisticated frauds, particularly ones as egregious and long-lasting as the fraud in this case, will be met with serious consequences.

To be sure, since his arrest in this case, the defendant has taken actions that are to his credit. Even though his brother chose to proceed to trial, the defendant's acceptance of responsibility through his guilty plea permitted the Government to conserve significant resources because a trial against him would have necessitated proving additional conduct not relevant to Suresh Munshani. In addition, in advance of his brother's trial, the defendant readily agreed when the Government asked whether he would consent to a search of his laptop computer, which contained important evidence that was introduced by the Government at Suresh Munshani's trial. Notwithstanding these salutary factors, the Government believes that a 60-month period of incarceration, which would amount to a significant discount from the applicable Guidelines range absent the statutory maximum, is just.

**C.     Conclusion**

For approximately eight years, the defendant greedily exploited his lofty and well-compensated position as CEO to engage in a brazen fraud that cost the Victim Company over $10 million. On these facts, the Government respectfully submits that a sentence of 60 months' imprisonment would adequately reflect the seriousness of his conduct, provide just punishment, promote respect for the law, and send a message to would-be fraudsters that a substantial jail term is the consequence of such harmful criminal actions.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By:     /s/
Timothy V. Capozzi
Steven J. Kochevar
Assistant United States Attorneys
(212) 637-2404

cc:     Mark Pearlstein, Esq. (by ECF)